**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
TRACTEBEL ENERGY MARKETING, INC.,   :
  :
         Plaintiff,   :      03 Civ. 6731 (HB)
  :
     -against-   :
  :
AEP POWER MARKETING, INC.,   :
AMERICAN ELECTRIC POWER COMPANY,   :
INC. and OHIO POWER COMPANY,   :
  :
      Defendants.   :
----------------------------------------------------------------x
OHIO POWER COMPANY and   :
AEP POWER MARKETING, INC.,   :
  :
    Counterclaim Plaintiffs,   :      03 Civ. 6770 (HB)
  :
     -against-   :
  :
TRACTEBEL ENERGY MARKETING, INC.,   :      <u>OPINION & ORDER</u>
TRACTEBEL S.A.,   :
  :
    Counterclaim Defendants.   :
----------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**[*]


     Tractebel Energy Marketing, Inc. ("TEMI") filed this action on September 5, 2003 and

AEP Power Marketing, Inc., American Electric Power Company, Inc., and Ohio Power

Company (collectively, "AEP") filed counterclaims.  A bench trial was conducted on March

23-25, 28-31 and April 1, 4-8, 2005, with respect to TEMI's claims and AEP's

counterclaims for breach of contract, and both parties' requests for declaratory judgments.

The parties submitted post-trial briefs on April 29, 2005, and closing arguments were held

on May 6, 2005.  The matter is now <u>sub judice</u>.

---

[*] Scott Eckert, a summer 2005 intern in my Chambers, and currently a second year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this Opinion.

# I. BACKGROUND

The dispute arises from an agreement entered into by the parties for the sale of energy products over a 20-year period. On November 3, 2004, this Court granted TEMI's motion to confirm the arbitration award, denied TEMI's motion for a primary jurisdiction referral and stay of proceedings, and denied AEP's motion for partial summary judgment on the issue of QF status.[1] On September 22, 2004, AEP moved for summary judgment in which it sought dismissal of Counts I and III of TEMI's Amended Complaint and a declaration that Counts V and VI are not grounds upon which the contract between the parties can be found unenforceable. On January 21, 2005, this Court denied summary judgment with respect to Counts III, V, and VI of the Amended Complaint, and entered a declaratory judgment on Count I, that stated that the absence of a Protocol did not void the parties' obligations under the contract. On March 23, 2005 the bench trial began.

# II. FINDINGS OF FACT

## A. Formation of the PPSA

On November 15, 2000, TEMI entered into a requirements contract, the Power Purchase and Sale Agreement ("PPSA") with AEP. The PPSA stipulated that over a 20-year period of time, AEP would supply large quantities of electric power and related products and services to TEMI from a cogeneration plant to be constructed in Plaquemine, Louisiana (the "Plaquemine Facility").[2] This facility was to be located within an existing complex owned by the Dow Chemical Company ("Dow"). AEP had the "sole and exclusive right" to operate the Facility, and TEMI had the "exclusive right" to the products it was to purchase under the PPSA. PPSA § 9.2-3.

---

[1] The Federal Energy Regulatory Commission gives QF status to cogeneration facilities that are (1) qualifying facilities under the Public Utility Regulatory Policy Act and the Commission's regulations; (2) permitted to sell electric energy and capacity to the host utility at the host utility's avoided cost rate; (3) not owned by an entity primarily engaged in the generation or sale of electric power; and (4) are largely exempt from the provisions of the Federal Power Act and the Public Utility Holding Company Act.

[2] Cogeneration is the use of a power station to generate heat and electricity simultaneously. Cogeneration allows a more total use of energy than conventional generation, potentially reaching an efficiency of 70-90%, compared with 50% for the best conventional plants. The Plaquemine Facility is a cogenerational facility because the same generating units that produce electricity also produce steam for use in Dow's manufacturing processes.

The Plaquemine Facility was conceived at a time of great optimism about the future of electricity prices. That enthusiasm led to the development within Entergy[3] of a number of cogeneration and other merchant generation plants in addition to the Plaquemine Facility; as a result, by 2003, there was a glut of excess generation within the Entergy region. (Dr. Edward Krapels Decl., DX-C259; Dr. Gordon Rausser, Tr. 813:12, Mar. 28, 2005.) The electricity markets were further eroded when Enron collapsed in 2001 and when the anticipated energy deregulation within the Entergy territory did not materialize as expected. (William Utt, Tr. 847:17-20, Mar. 28, 2005.) As a result, current and future projections for electricity prices within Entergy fell significantly in 2001 and 2002. This state of affairs damaged the relationship between these parties. TEMI realized it would lose a lot of money if it were to fully perform under the PPSA and tried a number of ways to extricate itself, while AEP's conduct can best be described as an attempt to maximize its profits by gaining the upper hand in the relationship.

TEMI approved the Plaquemine deal in March 2002 based upon a valuation of the transaction that forecast a profit of $80 million. (Stibolt Memo, DX-A16.) Unfortunately, by September 2002, the PPSA projected that TEMI was approximately $360 million "out of the money." (O'Hara Decl., DX-C255 ¶ 30.) Due in part to these numbers, and also the notice from AEP that the completion of the Plaquemine Plant would be delayed, TEMI began to contemplate restructuring the PPSA. In August 2002, TEMI sent AEP a letter that stated TEMI's "interest in modifying certain elements of the PPSA in light of . . . significant changes in market conditions during the past 18 months." (Fairley Email, DX-A025.) Soon thereafter, TEMI and AEP began to negotiate elimination of a "Gas Peaking Product" from the PPSA. (Thakur Email, DX-A135.) In order to relieve TEMI's immediate financial pressures, TEMI proposed a delay of the start date for delivery of all other products, and asked to lengthen the period for plant completion. (Fairley Email, DX-A144.) The parties successfully negotiated the elimination of the Gas Peaking Product in January 2003.

---

[3] Entergy is a large energy utility located in the southern United States, and is also the transmission service provider in the area where the Plaquemine plant is located. Dow has for many years had its own generation assets at the Plaquemine chemical plant and thus there was a preexisting interconnection between the plant and the Entergy transmission grid. (Tommy Rozas Dep., DX-C236 at 60-61.)

Pursuant to this amendment in the PPSA, TEMI agreed to pay AEP $250,000 per month for 24 months to commence at Actual COD.[4]

By February 2003, TEMI sought other significant revisions to the PPSA. (AEP Letter, DX-A148; Fairley Email, DX-A151.) For instance, TEMI proposed elimination of the contract provision that obligated TEMI to accept replacement products until the plant was completed, and suggested a delay of the Facility operation date ("Actual COD") to April 30, 2005. TEMI also asked for specific testing requirements in exchange for an increase in the capacity payments TEMI would make to AEP. Concurrently, TEMI calculated the amount that would be saved by such a delay of Actual COD at between $29 and $39 million. (Gelbaugh Email, DX-A116.) Responding to these numbers, TEMI's Joy Thakur emphasized: "the analysis implications are clear: WE WANT OUT!" (Thakur Email, DX-A150) (emphasis in original.)

Despite the projected $29 to $39 million savings, TEMI eventually offered AEP just $10 million to delay Actual COD. (Fairley Call Tr., DX-A187 at T0215315.) After AEP rejected this offer, TEMI's chief negotiator, David Fairley, reported to TEMI's Board that "commercial negotiations were not progressing smoothly, and that the situation was trending toward a legal solution." (DX-A173.) During this time, TEMI's economic outlook continued to worsen. In April 2003, the net present value of the Plaquemine deal to TEMI had fallen to negative $742 million by AEP's calculation, and to negative $729 million according to TEMI. (O'Hara Decl., DX-C255 ¶ 46; Orhon Email, DX-A036.) At this point it appears that TEMI turned its attention to trying to free itself from its obligations under the PPSA.

### B. Negotiation of Protocol

The PPSA, in order to be completely operational, contemplated another agreement. Specifically, the parties agreed to "enter into a mutually agreeable Dispatch/Operations Coordination Protocol (the "Protocol"), not later than June 1, 2001" which would "set forth the detailed requirements for notice, forecast, scheduling, dispatch, operation, maintenance, maintenance coordination, approvals and other matters related to the operations and

---

[4] Actual COD means the date on which Seller declares that the Project is able to supply Products. PPSA § 1.3.

maintenance (including outages) of the Project and the sale and delivery of the Products."
PPSA § 9.1. However, the Protocol never came to be, and there is no evidence that either
side cared, at least not until the completion deadline of June 1, 2001 had come and gone.
TEMI executives testified that AEP ignored this deadline, and failed to respond to TEMI's
inquiries in 2001 and early 2002 with a draft Protocol, and conversely, the testimony
showed that TEMI never insisted on compliance with the June 1 deadline. (Mark Witt Dec.,
TX 748 ¶¶ 14-17; Fairley Dec., TX 749 ¶ 27); Scott Slisher Decl., DX-C249 ¶ 46; DeRuntz
Decl., DX-C250 ¶ 35.) In fact, TEMI never communicated any particular drop-dead date by
which the negotiations of the Protocol had to be concluded. (Fairley, Tr. 113:10.)

Almost a year after the deadline in the PPSA for the completion of the protocol and on
May 29, 2002, a "kick-off meeting" was held at TEMI's headquarters on May 29, 2002.
There the parties agreed to exchange draft Protocol outlines within four weeks. (Jason
Sweeney, Tr. 300:5-9, 327:18-330:18, Mar. 24, 2005.) AEP sent nothing by the deadline,
and TEMI sent only a two-and-a-half page rough draft outline of the Protocol. (Moreland
Email, DX-A55.) This outline was far from a final Protocol, and both parties agreed that the
Protocol negotiations would be a back-and-forth process over several months. (DeRuntz
Decl., DX-C250 ¶ 37; Fairley, Tr. 128:15.) On several occasions thereafter, various TEMI
executives reminded AEP that it owed TEMI a draft Protocol, and on November 14, 2002,
AEP responded to TEMI's rough outline with a much more thorough document. (Draft
Protocol, TX 27.)

The facts show that while TEMI did make inquiries, neither party acted expeditiously as
the negotiations continued. TEMI now complains that it was "urgent" for the parties to
finalize the Protocol quickly, but TEMI took the next two-and-a-half months to improve
AEP's November 14, 2002 draft, and did not provide a marked-up draft until January 31,
2003. (Fairley Decl., TX 749 ¶¶ 47-48; Draft Protocol, TX 29.) Even then the parties
agreed this draft was not final, and had significant "gaps." (Slisher Decl., DX-C249 ¶ 77;
Fairley, Tr. 194:1-3.)

On February 4, 2003, AEP advised TEMI that AEP was in general agreement with
TEMI's January 2003 draft and would convert that draft into a Word document, without

change, and send it to TEMI in a few days to conclude the Protocol discussions. (Joseph DeRuntz, Tr. 1179:4-6, Apr. 4, 2005.) Instead, on April 4, 2003, AEP sent another draft which, according to TEMI, was substantially different and done to thwart the completion of the Protocol. (Draft Protocol, TX 32.) However, the proof demonstrates that AEP's April 2003 draft was offered as a legitimate attempt to complete – rather than frustrate – the protocol, and the changes do not appear to be significant. For instance, the PPSA provided for the Steam Peaking Product to be available on ten minutes' notice, yet AEP's April draft Protocol provided that this Product would only be available on notice of thirty minutes, and only on thirty minutes' notice before the top of the hour (i.e., as much as 89 minutes). (PPSA §3.3.4.1; Draft Protocol, TX 32.) This change according to AEP was included so the Protocol would comply with Entergy's scheduling requirements; such compliance was mandated by several provisions in the PPSA. PPSA §§ 9.3, 9.6, 9.8, 9.9. While TEMI's executives understood the importance of compliance with Entergy's requirements, apparently neither side considered it ahead of time. In fact, even TEMI's own June 2002 Protocol outline referred directly to the "need to conform to Entergy scheduling protocols." (Moreland Email, DX-A55.)

TEMI finds further fault with the April 2003 draft due to the fact that AEP eliminated references to how the qualifying facility ("QF") status of the plant could be exercised for TEMI's benefit. (Fairley Dec., TX 749 ¶ 81(c); Draft Protocol, TX 32.) During trial, the Court ruled that TEMI's arguments with regard to QF status were without merit since both the PPSA itself and federal law already dictated how the QF distribution of power would be handled. (Tr. 1737:01-38:15; Marvin Carraway, Tr. 363:17, Mar. 24, 2005; Joel Jansen, Tr. 1295:10, Apr. 4, 2005.)

Finally, TEMI contends that while the PPSA required AEP to make operating data available to TEMI on a "real-time" basis, the April 2003 draft stipulated that the majority of the operating data would be made available only on a daily basis. (PPSA § 9.7; Draft Protocol, TX 32 § 1.2, 1.3.) But there is no evidence that this was done in an effort to delay execution of the Protocol. The language of this draft Protocol makes clear that such data would be provided on a daily basis only in the event of "unplanned outages, force majeure

events, etc." Furthermore, in making this claim, TEMI flatly ignores § 1.3 of AEP's draft, captioned "Real-Time Information," which stated that "[r]ealtime information, including but not limited to generating, dispatch and outage information, will be conveyed to [TEMI] from [AEP] via telemetering, with back-up via email and telephone." (Draft Protocol, DX-A73 at § 1.3) (emphasis added.)

### C. AEP's Credit Guaranty Increase Request

In order to cover a termination payment[5] in the event of either party's default, the parties agreed to a $50 million guaranty upon execution of the PPSA, and to provide a copy of its annual report and financial statements upon request by either party. PPSA §§ 7.1.1, 7.2.1, 7.3. If at any time a party had "reasonable grounds to believe" that the other party's termination payment "would exceed the value of the guaranty," it could provide written notice and request an increase in the guaranty in the amount of the projected termination payment. PPSA §§ 7.1.2, 7.2.2. The other party would then have five business days to increase its guaranty or it would be in default. Id. In April 2003, AEP requested an increase in TEMI's guaranty based on its calculation of TEMI's projected termination payment, but TEMI refused to provide any additional guaranty based on its belief that AEP had made an unfounded demand that violated the "reasonable grounds" requirement of the PPSA.

Section 7.3 of the PPSA required the parties to exchange $50 million guaranties to cover their potential credit exposures. AEP could also request an increase in TEMI's guaranty at any time AEP had "reasonable grounds" to believe that the present value of "Gains" and "Losses," determined by PPSA § 7.1.2, exceeded $50 million. PPSA § 7.2.2. Under § 7.1.2, the Gains and Losses were to be determined by comparing the long-term Contract Price with the "market price" for each energy Product. The market price was to be "based on broker, dealer or exchange quotations" for the immediately ensuing "five year period . . . or such longer period for which a market is available." PPSA § 7.1.2. Section 7.1.2 also specified that, to calculate the projected Termination Payment, the market price of the

---

[5] PPSA § 12.2 stipulates that in event of default, the non-defaulting party may "accelerate all amounts owing between the Parties and to liquidate and terminate all obligations under this Agreement," withhold "payments due to the defaulting Party," and "suspend performance." The "termination payment" equals the aggregation of all settlement amounts into a single amount. PPSA § 12.3.

Products sold to TEMI "shall be based on broker, dealer or exchange quotations" for five years, escalated at 3% per year through the remaining term of the PPSA.

AEP made requests in May and June 2003 for increases in the $50 million guaranty, and claimed the right to new guaranties, variously, $436 million, $337 million, and finally $150 million. Both AEP and TEMI recognized that when AEP made its 2003 credit requests, the Entergy market was illiquid and lacked market prices going out to 2008 that could be escalated pursuant to PPSA § 7.1.2. (Thomas Barry, Tr. 1406:10-1409:3, 1411:14-17, 1425:4-13, 1426:15-1427:22, Apr. 5, 2005; Krapels Rpt., DX-C259 Ex. A at 7, 47, 48; Rausser Rpt., TX 757 Ex. A at 3, 12-21.) Therefore, AEP made a series of bids and offers (known as "two-ways") in order to ascertain the relevant market prices. Of the 137 calendar year quotes for 2004-2008 "into Entergy" products, AEP made 135 of them over a period of two days, May 2 and June 13, 2003.

TEMI contends that these "two-ways" were dishonest attempts to inflate a non-existent market, and that AEP effectively planted its own quotations, then made credit demands as if those quotations reflected that market. While AEP's actions in placing so many bids over just two days may have been disingenuous, it doesn't negate the fact that AEP was entitled to request a credit guaranty increase, nor does it negate the fact that AEP had few alternatives under the terms of the PPSA. The PPSA called for market prices to be set based on "broker, dealer or exchange quotations" for the ensuing five years. PPSA § 7.1.2. Essentially, AEP has done just this. Thus, it is difficult for TEMI to claim that AEP acted inappropriately in this regard.

Furthermore, the facts demonstrate that this use of "two-ways" as a means of price discovery was a common practice at AEP, used in a variety of contexts, and that TEMI itself had used "two-ways" as a means of market price discovery. (Barry Decl., DX-C253 ¶ 11; Moreland, Tr. 1399:14-18; Faizmin Lokhandwalla Dep., DX-C229 at 47-50.) Additionally, AEP's traders confirmed at trial that AEP's bids and offers were fully executable, that if another party decided to act on AEP's numbers, AEP would actually follow through and consummate the transaction, and that the brokers to whom these "two-ways" were communicated understood this as well. (Barry Decl., DX-C253 ¶ 17; Moreland Decl., DX-

C254 ¶ 10; Scott Lombino, Tr. 283:9-284:5, Mar. 24, 2005; Christopher McGee, Tr. 491:17, Mar. 25, 2005; Wassersug Dep., DX-C243 at 55, 56; Gonzalez Dep., DX-C225 at 35; Feeley Dep., DX-C223 at 33.)

Also, TEMI was fully aware that its liability on the Plaquemine deal was greater than the $50 million guaranty. On April 22, 2003, Lora Kinner, Director of Credit at TEMI sent an internal email that read in part, "[w]e are also aware that the exposure on this deal far exceeds the $50 million TSA guaranty currently held by AEP. Under the current contract terms, AEP has the right to call for additional credit assurance, and . . . I anticipate the possibility of AEP making such a request." (Fairley Email, DX-A033.) On April 23, 2003, TEMI calculated its own Termination Payment due AEP to be $667 million, and that shortly thereafter, TEMI's calculation produced a projected Termination Payment due AEP of $729 million. (Ansari Email, DX-A034; Roger Stibolt, Tr. 557:16, 559:25, Mar. 25, 2005; Orhon Email, DX-A036.)

### D. Replacement Products

The PPSA stipulated that the Plaquemine Facility was to be in operation by May 1, 2003, and that in case this date was not met, AEP would provide TEMI with Replacement Products,[6] or AEP would pay TEMI the Replacement Price.[7] PPSA §§ 11.4, 11.5. In Spring 2002, AEP informed TEMI that the plant would not be operational by the target date. The following year, AEP attempted to provide TEMI with Replacement Products; however, TEMI refused to accept the Replacement Products and claimed the products did not meet the specifications as defined in the PPSA. AEP billed TEMI for the Replacement Products despite TEMI's rejection.

Because the Plant was not complete by May 1, 2003 deadline, AEP was required to provide Replacement Products to TEMI that were "substantially equivalent to the Product intended to be replaced." PPSA §§ 1.133, 11.4, 11.5. The various components of the

---

[6] "Replacement Products" means any capacity, energy, or ancillary services from a generation source other than the Project substantially equivalent to the Product intended to be replaced. PPSA § 1.133.
[7] "Replacement Price" means the price at which Buyer, acting in a commercially reasonable manner, purchases a replacement for any capacity, energy, or ancillary services not delivered by the Seller, plus any additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, not to exceed the market price at the Delivery Point for such capacity, energy, or ancillary services. PPSA § 1.132.

Replacement Products were to originate from a single "generation source." Id. In mid-March 2003, TEMI asked for a written description of the Replacement Products AEP intended to provide. (Slisher Decl., TX-85 ¶ 69.) Two days later, AEP provided a detailed description of the Products. (Slisher Decl., TX-85 ¶ 71.) This description provided that AEP would deliver Firm LD Energy[8] and Unit Contingent Capacity for each of the Products.

While the products offered by AEP may not have been perfectly equivalent to those described in the PPSA, they do appear to be substantially equivalent. In general, Firm LD Energy is a superior product to the unit contingent product TEMI stood to receive post-COD. According to Entergy Power Marketing, "it is generally accepted in the industry that unit contingent or non-firm power is generally worth less than firm power." (Jansen Decl., DX-C252 ¶ 44; Slisher Decl., TX-85 ¶ 74.) In any event, the difference between the products did not matter to TEMI, as TEMI had sought the exact same Firm LD Energy replacement just a month before when it attempted to restructure the PPSA. (Fairley Email, DX-A151 at § 1.82; Jansen Decl., DX-C252 ¶ 45.)

Although TEMI claims that AEP failed to meet these provisions of the PPSA, the proof suggests that TEMI was not going to accept the products regardless of what was offered. Despite Firm LD Energy's superiority, and despite the fact that it had previously sought this very product, TEMI refused to accept Firm LD Energy as a Replacement Product. Ultimately, TEMI went on to reject every offer of Replacement Products for nearly a year. (Marshall, Tr. 444:16-23.) TEMI's own traders noted "TEMI was not going to accept any of the replacement power that AEP offered." (Sweeney, Tr. 326:10; DX-A79.) AEP's Marcus Moreland was told there was "nothing" that AEP could offer that TEMI would take. (Moreland, Tr. 1494:1-2.)

### E. AEP's Declaration of Actual COD

The PPSA provided that AEP would declare Actual COD no later than April 30, 2004. PPSA § 1.3. The finished plant would offer three Products with a total Capacity of 800

---

[8] Firm LD cannot be interrupted for physical or economic reasons, as is the case with contingent power. (Jansen Decl., DX-C252 ¶ 41.) Furthermore, Firm LD Energy includes the right to damages if it is not delivered, while unit contingent power provides no such remedy. (Slisher Decl., DX-C249 ¶ 74.)

megawatts, of which a minimum 95%, or 760 megawatts, had to be available at Actual COD and for the first year of operation as follows: 589 megawatts for the Baseload Product, and 85.5 megawatts for both the Steam Peaking and Baseload Augmentation Products. PPSA §§ 3.1.1, 3.1.2, 3.2.1, 3.2.2, 3.3.1, 3.3.2. TEMI contends that AEP declared Actual COD when it knew that these levels could not be met.

However, according to the PPSA, both the Declaration of Actual COD and the determination of product capacities were left solely to AEP. (PPSA §§ 3.1.2, 3.2.2, 3.3.2; Kelly McGrath, Tr. 946:11, Mar. 29, 2005.) The PPSA itself imposed no concrete testing requirements or methodologies, and TEMI has fully acknowledged this fact. While TEMI proposed that specific testing requirements be incorporated into the revised PPSA it sent to AEP in February 2003, those testing provisions were never agreed upon, and so AEP is not bound by them. (Fairley Letter, DX-A151 at § 1.16; DeRuntz Decl., DX-C250 ¶ 65.)

### III. CONCLUSIONS OF LAW

#### A. TEMI's Breach of Contract Claims

A party who materially breaches or repudiates a contract cannot enforce it, and the non-breaching party may declare the contract terminated. Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 79 (1st Dep't 2002); Restatement (Second) of Contracts §253(2) (1981). It is upon this fundamental tenet of contract law that TEMI bases its claims. Specifically, TEMI maintains that AEP's actions were in an effort to construct an anticipatory breach of express provisions of the PPSA as well as the implied covenant of good faith and fair dealing through a series of bad faith negotiations of the Protocol, Replacement Products and declaration of Actual COD. Therefore, TEMI argues, AEP's breaches negated any breach on TEMI's part, and excused TEMI from having to perform its contractual obligations.

The choice-of-law provision in PPSA § 16.6 states that the rights and duties of the parties are to be governed, enforced and performed in accordance with the laws of the State of New York. Under New York law, anticipatory repudiation requires an unequivocal statement that a party will not perform the contract if the other party fails to meet a demand

not authorized by the contract. See Stanford Square, L.L.C. v. Nomura Asset Capital Corp., 228 F. Supp.2d 293, 299-300 (S.D.N.Y. 2002)(anticipatory repudiation occurs when there is "'a definite and final communication of the intention to forego performance'")(citation omitted). A party's attempt to exercise its rights and maximize its benefit under an agreement, as it appears in this case, does not meet this standard. AEP never presented any demand not in some way authorized by the PPSA, and never stated it would not perform. TEMI argues that the Standstill Agreement entered into by the parties in June 2003 provided a clear communication by AEP that it did not intend to perform. (Tr. 1960:23-61:05.) But this Agreement stipulated that the parties would continue to negotiate and if negotiation were unsuccessful, the parties would seek declaratory judgments from the Court. (TX. 668.) It did not constitute an affirmative statement from AEP that it did not intend to perform or to repudiate the PPSA.

### i. Breach of Implied Covenant of Good Faith

TEMI claims that AEP breached the implied covenant of good faith and fair dealing. Such a covenant is inherent in every contract. Travellers Int'l A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994). Encompassed within this covenant are two components that are relevant to TEMI's claims. First, the covenant stands for the principle that "neither party 'shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87 (1933)). Second, the implied covenant prohibits dishonest conduct. Broder v. MBNA Corp., 281 A.D.2d 369, 370-71 (1st Dep't 2001). The implied covenant is "not without limits." State Street Bank and Trust Co. v. Inversiones Erraazuriz Limitada, 374 F.3d 158, 170 (2d Cir. 2004), cert. denied, 125 S. Ct. 1309 (quoting Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (Ct. App. 1995)). It does not require a promisor to take actions that are contrary to its own economic interests. Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc., 322 F. Supp.2d 482, 494 (S.D.N.Y. 1992). A party can act in its own interests in such a way that may, reduce the other party's benefits from the contract. Travelers Indem., Co., 322 F. Supp.2d at 494.

TEMI argues that many of AEP's actions were in violation of the implied covenant, and that AEP is therefore in breach of the PPSA. Specifically, TEMI claims that AEP negotiated the Protocol in bad faith, ignored deadlines, and frustrated negotiations with its April 4, 2003 draft. TEMI sees further evidence of bad faith in AEP's request for a credit guaranty increase, as well as in AEP's declaration of Actual COD. Because of these perceived breaches, TEMI argues, it was justified in terminating the PPSA on September 4, 2003.

### 1. *Negotiation of the Protocol*

Although AEP may not have acted expeditiously at all phases of the negotiation of the protocol, it cannot be said that its actions constituted a pattern of bad faith that rises to the level of a material breach. The proof showed that neither party was in a panic to get the protocols completed despite the fact that it left so many issues open with respect to how the parties were to deal with each other. TEMI argues in addition to delay that AEP's April 2003 Draft Protocol was offered in bad faith to discourage resolution of certain issues. While it made changes, such as the notice provision for the Steam Peaking Product, they were based on reasonable concerns, e.g., compliance with Entergy standards. In any event, it does not appear from the proof that it was issued in bad faith or more particularly to delay or avoid the execution of the protocol. No one at AEP ever represented that this was a "take it or leave it" proposition, and there was always the possibility of further discussions. (See Slisher Decl. ¶ 81; DeRuntz Decl. ¶ 53.) TEMI's arguments that AEP was the reluctant party are further undermined by the fact that TEMI never responded to this Draft Protocol with a mark-up of the AEP Draft, or a draft of its own. (See Jansen Decl., DX-C252 ¶ 26; DX-B356 (Tierney letter June 24, 2003)("[w]e have sent you our proposed operating protocols and look forward to mutually completing the protocols."))

### 2. *Credit Guaranty Increase*

While now there might be some question as to the calculation of what the Credit Guaranty increase should have been, it does not make the request itself improper or in bad faith. TEMI agreed that its exposure exceeded the bargained $50 million guaranty and AEP was entitled to an increase. At the time, TEMI's calculations were in the same range as

those contemplated by AEP. AEP's submission of bids and offers or "two-ways" into the market in order to ascertain the relevant market prices was in accordance with PPSA § 7.1.2. The fact that almost all the bids over a two day period came from AEP does give some pause, but it does not appear that AEP had much alternative under the contract. TEMI claims that the different amounts requested by AEP – $436 million, $337 million, and finally $150 million – evince bad faith. At worst, these facts show that no one knew what to make of a non-existent marketplace, and AEP was reasonable in decreasing the amount demanded. Interestingly, in the end, TEMI refused to provide any increase in the guaranty and suffered no economic loss as a result of these requests.

### 3. Replacement Products

TEMI attempts to establish further bad faith claims based on issues surrounding the Replacement Products. The PPSA stipulated that if the Plaquemine Facility was not operational by May 1, 2003, AEP would provide TEMI with Replacement Products, and that these Replacement Products would be "substantially equivalent to the Product intended to be replaced." PPSA §§ 1.133, 11.4, 11.5. It is TEMI's contention that AEP has breached the PPSA by failing to provide substantially equivalent Replacement Products. Thus, TEMI continues to build its house of cards and argues here that it was excused for its non-performance of contractual duties because AEP was already in breach. However, AEP's performance in providing the Replacement Products is not material and does not excuse TEMI from performance.

TEMI argues that AEP provided capacity and energy from different sources even though the PPSA stipulated that such products were to come from a single source – in this case, the Plaquemine Facility. PPSA § 1.133. According to TEMI, this provision of energy from different sources was problematic because customers in Entergy did not want capacity and energy from different sources, and also because the Entergy tariff required that energy and capacity originate from the same source. (Carraway Rpt., TX751 at 32-33; Fairley Decl., TX 749 ¶ 76(a); Entergy Rpt., TX 607 at 273.) However, TEMI's own expert testified that Firm LD Energy by itself encompasses both energy and capacity. (Carraway, Tr. 368:24.)

Regardless, TEMI fails to offer any evidence that a product with energy and capacity from different sources is not substantially equivalent to the Replacement Product offered by AEP.

TEMI argues that AEP insisted on notice periods that were longer than those provided in the PPSA. For the 10-minute Steam Peaking Product, AEP insisted upon 75 minutes notice. For the Baseload and Baseload Augmentation Products, the PPSA required one-hour notice; AEP changed this to one hour and fifteen minutes. TEMI argues that these changes are significant because longer notice periods make for a less valuable product. (Slisher Email, TX 85; Carraway Rpt., TX 751; Fairley Decl., TX749 ¶ 76(b)-(d).) In making this argument, TEMI neglects to point out the fact that Entergy transmission scheduling requirements that made delivery of the Steam Peaking Product impossible on ten minutes' notice. Additionally, the Steam Peaking Product was only a small component of the entire Replacement Product transaction. The total amounts invoiced for the Steam Peaking Products from May 2003 through March 2004 accounted for only 3.3% of the total amount invoiced for Replacement Products. (Jansen Decl., DX-C252 ¶ 49.) While AEP may have erred when it changed the notice provision for the Baseload and Baseload Augmentation Products, this fifteen minute change is hardly a material breach.

Finally, TEMI argues that AEP insisted on a pricing assumption of 100% availability irrespective of actual availability, whereas the PPSA provided for an "Availability Adjustment" to account for non-functional generating units. (Slisher Email, TX 85 at AEP026795; PPSA §§ 5.1.1, 5.2.1, 5.3.1.) TEMI illustrates its desperation when it argues that this is a material breach when in fact AEP expressed its willingness to remove this provision from its summary of Replacement Products. (Fairley Tr., TX-119 at T0215348.) ("We don't mean to imply, by any means that we have somehow automatically locked-in 100% up-front.")

Ultimately, TEMI's claims of bad faith with regard to the Replacement Products are diluted by the fact that the Firm LD offered by AEP was a superior product to the Replacement Product described in the PPSA, and also by the fact that TEMI had previously sought this very product. It runs contrary to any notion of fairness to assert that AEP did not comply substantially because it complied too well.

Had AEP failed to offer substantially equivalent Replacement Products during the pre-COD replacement period, TEMI's "sole and exclusive" remedy was to "cover" and charge AEP the Replacement Price. PPSA §§ 11.4, 11.5, 11.7. Despite this remedy, TEMI never sought to "cover" by securing alternate Replacement Products, nor did TEMI make arrangements to sell any products to any third party, they simply rejected out of hand, the AEP products. (Sam Henry, Tr. 753:7, Mar. 28, 2005; Fairley Decl., TX-119 at T0215359.)

Finally, beyond its allegations that AEP provided Replacement Products that were not substantially equivalent to what the PPSA stipulated, TEMI alleges that AEP's actual billing for these Products was in bad faith. AEP billed TEMI $116.5 million for the Replacement Products it offered from May 1, 2003 through March 31, 2004. (Henry Decl., TX 756 ¶¶ 13, 16-18.) However, the PPSA explicitly requires TEMI to make capacity payments, starting at Target COD, "under all circumstances without regard to . . . whether [AEP] shall deliver any Energy . . . whether [AEP] supplies Replacement Products . . . or whether at any time [TEMI] elects to receive less than the entire" product. PPSA §§ 5.1.1, 5.21., 5.3.1. TEMI admitted that it was required to make capacity payments commencing May 1, 2003. (Thakur Dep, TX-C239 at 53.) Additionally, the PPSA stipulates that "[n]otwithstanding anything to the contrary in this agreement, [TEMI] must at all times during the Delivery Period request, take and pay for delivery of . . . Baseload Energy." PPSA § 3.1.4.4. The PPSA states that the Delivery Period is to begin with the Target COD of May 1, 2003. Thus, TEMI was required to pay for a minimum amount of the Baseload Product as of that date. (PPSA §§ 1.156, 1.157; Jansen Decl., DX-C252 ¶ 52.)

### 4. *Declaration of Actual COD*

It does not appear that AEP's declaration of Actual COD was improper. Under the PPSA both the Declaration of Actual COD and the determination of product capacities were left solely to AEP. The PPSA imposed no testing requirements on AEP prior to its declaration of Actual COD. After the PPSA was executed, TEMI tried to incorporate specific testing requirements into the PPSA, but they were never agreed upon so AEP is not bound by them. TEMI alleges bad faith in AEP's declaration of Actual COD because AEP did not comply with "Good Engineering Practices." AEP did conduct a variety of tests

relating to the facility before concluding that in its judgment capacity levels would be met under the PPSA. Dow accepted AEP's declaration and continues to accept power from the Plaquemine Facility. In short, there is no indication that AEP could not meet the levels contemplated in the PPSA, and there is no evidence to suggest AEP's declaration of Actual COD was dishonest or in bad faith.

### ii. Breach of Express Provisions of the PPSA

In addition to its claims that AEP breached the implied covenant of good faith and fair dealing, TEMI contends that AEP has materially breached various express provisions of the PPSA. To prevail on this breach of contract claim, TEMI must prove by a preponderance of the evidence "(1) the existence of an express warranty, (2) material breach of the warranty, (3) damages proximately resulting from the material breach, and (4) justifiable reliance on the warranty." Metromedia Co. v. Fugazy, et al., 983 F.2d 350, 360 (2d Cir. 1990). A party to a contract is not excused from the performance of its contractual duties unless the other party commits a material breach. "A nonperforming party is liable for any breach of contract, but the other party is discharged from further performance, and is entitled to substantial damages only when there is a material breach." In re Krueger, 192 F.3d 733 (7th Cir. 1999) (emphasis added). For a breach of contract to be material, it must "go to the root" or "essence" of the agreement between the parties. Frank Felix Associates, Ltd. v. Austin Drugs, Inc., 111 F.3d 284 (2d Cir. 1997).

TEMI argues that AEP repudiated the PPSA by refusing to provide the Steam Peaking Product on ten minutes' notice as required by PPSA § 3.3.4.1, and further contends that AEP requested an increased credit guaranty without the "reasonable grounds" required by PPSA § 7.1.2. However, as discussed earlier, AEP's actions regarding the Steam Peaking Product were necessary to ensure that the Protocol would comply with Entergy's scheduling requirements. TEMI's argument concerning the Credit Guaranty increase is also flawed in light of the fact that in April 2003, TEMI calculated its own Termination Payment due AEP to be between $667 and $729 million. Thus, it would appear that AEP certainly met the "reasonable grounds" requirement of the PPSA.

TEMI also argues that AEP has breached the dispatch and transmission priority requirements of the PPSA §§ 3.7, 4.3 and 9.3. PPSA § 9.3 gave TEMI the "exclusive right" to "[d]ispatch and receive" and to "utilize" and "market" each PPSA product. Implementing these rights, PPSA § 4.3 provides that the interconnection between the Plaquemine and Entergy transmission systems would operate in such a way that "the entire Capacity and associated Energy and Ancillary Services generated by the Project shall have transmission priority on such [connections] sufficient to deliver such entire output to the Delivery Point." PPSA § 3.7 precluded AEP from taking any action "under its agreements with Dow" that would have a "material adverse effect" on the transactions contemplated by the PPSA.

TEMI contends that AEP violated § 4.3 by establishing a configuration that enabled Dow to divert TEMI's power, and that in doing so, AEP breached PPSA §§ 9.3 and 3.7 by destroying TEMI's Dispatch rights and taking actions with Dow having adverse effects on PPSA transactions. According to TEMI, AEP purposely enabled Dow to divert Capacity from PPSA Products and thus serve as Dow's own backup system. In support of this claim, TEMI draws primarily upon the testimony of AEP's expert Jasper, who stated that in emergency conditions, "there may be times when Dow would have to take some power from the Project." (Jasper Rpt., DX-C258 at 25.)

TEMI's arguments in this regard, too, are unfounded. PPSA § 4.3 recognizes that the transmission facilities would connect not only to the "Facility," but would also connect "Dow's existing generating facilities to the Transmission System[.]" The evidence and testimony shows that TEMI was well aware of this necessary interconnection throughout all phases of the project. TEMI received copies of plant integration diagrams which clearly showed that the new generating plant would be connected to the Entergy grid through the existing Dow connection. (Power Point Presentation, DX-A254 at 3539; Utt Email, DX-A325.) Furthermore, it seems apparent that AEP took reasonable steps to prevent Dow from "taking" power from the Facility. This is evidenced by the fact that AEP's contract with Dow, executed after the PPSA was signed, expressly provides that all power from the plant (except authorized reservations by Dow) belongs to AEP. (Dow PPA, DX-C98.) Furthermore, Dow fully understands that it is required to deliver all requested power to

AEP.  (Chapman Dep., at 61.)  Finally, AEP included a provision in its contract with Dow that if Dow were to "take" power from AEP, it must provide immediate replacement power that is "equivalent in all respects."  (Dow PPA, DX-C98 § 2.4.1(f).)  Thus, AEP has satisfied its obligation to ensure that TEMI would have the exclusive right to dispatch Products from the Plaquemine Facility.

In light of the above, I conclude that TEMI has failed to carry the necessary burden to frame a material breach by AEP.

### B. AEP's Breach of Contract Claims

AEP maintains that TEMI breached the PPSA by: (a) repudiating, and failing to provide assurances of, the PPSA; (b) refusing to pay for the minimum Baseload Energy, Baseload Capacity, and capacity for all other Products following Actual COD; (c) failing to increase its credit guaranty in violation of PPSA § 7.2.2; and (d) failing to make payments required by the January 15, 2003 Gas Peaking Amendment.  TEMI does not contest the validity of these claims individually; rather, TEMI puts all of its eggs in one basket by asserting that it had been released from its contractual duties under the PPSA due to what TEMI perceived as AEP's breaches.  Because AEP did not materially breach any provisions of the PPSA, and because AEP's dealings were not in bad faith, TEMI was not justified in terminating the PPSA on September 4, 2003.  Therefore, AEP is correct in its assertion that TEMI has breached the PPSA by refusing to pay for Energy, Capacity and Products after Actual COD, failing to increase its credit guaranty, and failing to make payments required by the Gas Peaking Amendment.

### IV. DAMAGES

#### A. Gas Peaking Amendment Payments

Pursuant to the Gas Peaking Amendment to the PPSA, TEMI agreed to pay AEP $250,000 per month for 24 months commencing at Actual COD.  (DX-A148.)  TEMI has failed to make these payments, and AEP is entitled to damages of $6,000,000.

### B. Replacement Products

AEP billed TEMI monthly for capacity and Replacement Products TEMI was obligated to take, including Baseload Capacity, Baseload Augmentation Capacity, Steam Packing Capacity, and Baseload Energy (the "must take"). The invoices total $116,499,287. TEMI has failed to make these payments; therefore, AEP is entitled to damages of $116,499,287. While a theory that might result in a reduction of this amount may be valid, none was advanced by TEMI and consequently there is no factual basis in the record to permit me to reduce the award amount.

### C. Post-COD Products

After Actual COD, TEMI was required to take and pay for the minimum Baseload Energy and Baseload Capacity, as well as capacity for the Baseload Augmentation and Steam Peaking Products. PPSA §§ 3.1.4.4, 5.1.1, 5.2.1, 5.3.1. AEP sought assurances that TEMI would take and pay for these products after Actual COD, but TEMI refused to provide assurances and refused to take and pay for the Products. (Tierney Letter, DX-B443, Henry Letter, DX-B444, Tierney Fax, DX-B445.) Therefore, AEP is entitled to damages of $493,570.

### D. Termination Payment

AEP seeks damages based on the Termination Payment due AEP as a result of TEMI's breach of the PPSA.[9] It is essentially a request for lost profits projected over the 20 year length of the contract. Termination payment damages under the PPSA § 12 are a "Settlement Amount" defined as "Losses or Gains, and Costs." "Losses" are "the present value" of "the economic loss (exclusive of Costs) resulting from the termination of this Agreement," and "Gains" are "the present value of the economic benefit . . . resulting from the termination of this "Agreement." AEP claims that its Losses will exceed its Gains by a present value of $520.6 million over the next twenty years.

---

[9] The Termination Payment is equal to the difference between the payments TEMI was required to make to AEP under the PPSA and the market value of the products TEMI was purchasing. PPSA §§ 12.2, 12.3.

### i. Recovery of Lost Profits

In an action for breach of contract, a party is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty. Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986). "[T]he damages may not be merely speculative, possible or imaginary." Id. Third, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." Id.

As the party seeking lost profits damages, AEP has the burden of proving that the amount claimed is reasonably certain. It is important to note that reasonable certainty does not mean absolute certainty. "Damages resulting from the loss of future profits are often an approximation. The law . . . requires only that damages be capable of measurement based upon known reliable factors without undue speculation." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). "[I]n the case of a new business seeking to recover loss of future profits, a stricter standard is imposed." Id. at 404. This is because "there is no track record upon which to base an estimate." Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000). See also Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F.Supp. 1051, 1065 (S.D.N.Y. 1996), aff'd, 108 F.3d 1369 (2d Cir. 1997) ("we have found no case from a New York State court permitting a recovery of lost profits to a new business") (internal quotations omitted). Projections of future profits based upon "a multitude of assumptions" that require "speculation and conjecture" do not provide the requisite degree of certainty. Kenford, 67 N.Y.2d at 262.

### ii. Expert Calculations of Future Profits

In order to calculate the amount of the Termination Payment, AEP enlisted Dr. Edward Krapels ("Krapels"), and TEMI has offered the analysis of its own expert Dr. Gordon Rausser ("Rausser"). The facts and testimony suggest that neither expert provided entirely reliable calculations of lost profits and the calculations from both experts, leaving aside credibility gaps, failed to meet the "reasonable degree of certainty" test.

Dr. Krapels is the founder of Energy Security Analysis, Inc., and head of its Gas and Power Practice. His firm specializes in analyzing energy markets and forecasting electric power prices, and he has been involved in the energy industry for more than 25 years.

Krapels' methodology for calculating the Termination Payment was as follows: First, Krapels totaled the payments AEP was to receive from TEMI under the PPSA ($646 million), and then subtracted the revenues that AEP may be expected to earn from Plaquemine in the absence of payments from TEMI. To calculate these revenues, Krapels estimated a range of potential values, incorporating a variety of alternative scenarios that allowed for the testing of extreme assumptions. Based on this approach, Krapels estimates revenues between $40 and $229 million to AEP without the PPSA, with a most likely case of $126 million. Subtracting these figures from the amounts TEMI owed under the PPSA, Krapels estimated that AEP's damages are between $417 million and $604 million, with the most likely case being $520 million.

In response to Dr. Krapels, TEMI has offered the analysis of Dr. Gordon Rausser ("Rausser"), who employed a revenue model marketed by a company called Altos. Rausser estimated the present value of expected payments from TEMI to AEP at $514 million. Not surprisingly, Dr. Rausser estimated a significantly higher range of potential revenues from the Plaquemine Facility, eventually settling on a "base case" of approximately $887 million, and net revenues (after payment of the $514 million to AEP) of about $373 million. (Rausser Decl., TX-757 at 52, 60.)

If one had to choose, Krapels' pedigree suggests that he is better equipped to project lost profits. Krapels is a business economist whose experience has always focused on actual commercial issues in the energy industry. (Krapels, Tr. 1741:22.) He has provided advice on billions of dollars of power market investments over the last 25 years. (Krapels Decl., DX-C259 ¶ 16.) Conversely, Rausser was trained as an agricultural economist, and less than 20% of his experience has been in the energy industry. (Rausser, Tr. 1758:6.) Despite his experience in the energy industry, Krapels' formula contained misdirection and conflicting data that made it impossible for TEMI to replicate his results. At trial, Krapels testified that the discrepancies in his models were due to two different data sets that covered

different geographic areas. (Tr. 1796:10-97:7.) While seemingly plausible, it hardly enhanced his faltering credibility or confidence in his analysis.

TEMI disputes AEP's calculation of Termination liability, arguing that Dr. Krapels' analysis was also flawed due to the fact that Krapels used two of his own firm's models to project and analyze energy revenues and capacity revenues, and also used the commercially available PowerWorld model to determine energy flows. (Krapels Decl., DX-C259 at 65, 79, 80-81.) Krapels stated that he had not "compared the advantages of the models [he] used with any other models," that he was not familiar with any of the commercially available electricity market models aside from the one he used, and that none of the models he used had been evaluated by independent third parties or peer-reviewed to his knowledge. (Dr. Edward Krapels, Tr. 1749:12-19, 1750:1-21, 1752:21-23, Apr. 6, 2005.) While TEMI notes that Rausser may have considered more models than Krapels, nowhere has TEMI demonstrated that the models employed by Krapels were in any way inadequate, nor has TEMI proven the superiority of Rausser's Altos model. Furthermore, PowerWorld is a widely used power flow model, selected by hundreds of users within the industry. (Krapels, Tr. 1748:20-23.)

TEMI goes on to dispute Krapels' methodology because Krapels' calculations were predicated upon a great number of "subjective judgments" about events over the next 20 years. (Krapels, Tr. 1807:15-1808:21.) TEMI criticizes the incorporation of such subjective judgments: "Future market conditions, such as new capacity, retirements, and transmission upgrades need to be assumed by Mr. Krapels, which means that they are not calculated by the model, but are based on subjective assessments that are not consistent with market conditions." (Rausser Decl., TX 758 at 11.)

Rausser's model suffers from its own problems in that it appears not grounded in reality. For instance, Rausser's analysis (projecting $373 million net revenues from the Plaquemine plant) defies common sense because it implies not only that the Plaquemine plant revenues (without the PPSA) will far exceed Krapels' estimate, but that they are in fact much greater than the payments TEMI would have made to AEP under the PPSA. Put another way, according to Rausser's figures, TEMI is actually harmed by the termination of the PPSA

(i.e., TEMI could have sold the power for far more than it would have paid for it). Despite this, TEMI has never sought damages for any of the amounts outlined in Rausser's report.

Furthermore, Rausser relies upon seemingly unrealistic assumptions about events over the next twenty years. Perhaps the single most flawed element of the Rausser/Altos model is the assumption that, over the next two decades, approximately 4.5% of all coal plants will be retired each and every year. (Krapels Analysis, DX-A480 at 236912.) However, coal plants currently remain extremely profitable. (Krapels, Tr. 1834:19-21.) While Rausser's 4.5%-per-year-coal-plant-retirement assumption envisions an energy market focused on imported natural gas, the testimony demonstrates that such an assumption is unsupportable and our of sink with current political realities, as well as the fundamental principle of diversity in fuel generation options on which utilities operate. (Rausser, Tr. 829:23; Frank Gallaher, Tr. 1623:8-11, Apr. 6, 2005. ("Utility companies are going to try to diversify their fuel sources" and energy policy based on dependence on natural gas would be "foolhardy" and not likely to be adopted.) In fact, Rausser admitted that official predictions contemplate that coal use will actually increase in the years ahead. (Rausser, Tr. 826:13.) When Krapels ran the Altos model without this 4.5% retirement factor, the value of the Plaquemine Facility fell by more than $500 million, a figure that accounts for more than 65% of the difference between the experts' models. (Krapels, Tr. 1836:5-9.) Finally, the ultimate test of Rausser's assumptions is the marketplace. While Rausser asserts that the net present value of the products from the Plaquemine plant may be as high as $577 million, this figure appears unrealistic in today's market, as over the last three years, no power plants in the Southeast have sold for anything close to Rausser's value. (Krapels Decl. ¶ 5.)

It is inherently speculative to determine lost profits by any business over a period of twenty years. Both Krapels and Rausser agreed that the usual technique for such projections, using forward market prices to estimate future revenues, could not be employed in this case. (Krapels Rpt., DX-C259 Ex. A at 12 (forward markets do not have "sufficient depth and liquidity" to use in assessing the value of the PPSA over its twenty year term); Krapels Tr., 1821:21-22 ("there is no meaningful forward price curve for electricity"); Rausser Rpt., TX 757 at 3 ("a market did not exist as evidenced by the lack of actual

transactions, as well as other factors," and that "the absence of a market" requires the use of a "substitute method" to evaluate the PPSA.).)

Furthermore, this substitute method required "a large number of assumptions" to support AEP's claim of $520 million lost profit damages. (Krapels Tr., 1807:17-19.) In order to know what AEP's revenues would be over the next twenty years, one would have to be able to presage a vast and varied body of facts. Any projection of lost profits would necessarily include assumptions regarding the price of electricity and the costs of operating over twenty years. One would also need to surmise what competing forms of energy such as coal and nuclear energy would cost over the same time period. Also factoring into this calculation are the political and regulatory developments over twenty years, population growth in the Entergy region, and technological advances affecting the production of power and related products. With so many unknown variables, these experts might have done as well had they consulted tealeaves or a crystal ball.

Finally, it is telling that Dr. Krapels, who according to AEP is an expert armed with the experience and tools necessary to make such a calculation, could still only muster an estimate of lost profits falling somewhere between $417 and $604 million. Thus, we are left with a gap of $187 million dollars between the low- and high-end estimates of AEP's possible lost profits. Although the term "reasonable certainty" brings with it a measure of flexibility, it does not include a margin of error of hundreds of millions of dollars, and thus AEP has failed to prove its calculations with the requisite reasonable certainty.

### iii. Future Profits for a New Business

This conclusion is reinforced by the fact that the Plaquemine Project appears to be a new business. The Second Circuit's decision in <u>Schonfeld</u> is instructive on this matter. In <u>Schonfeld</u>, a cable television operation was held to be a new business where the parties to the contract were entering into a "new market" with "no established customer base." <u>Schonfeld</u>, 218 F.3d at 173. Furthermore, the parties "had never jointly operated" a business before, and yet were contracting for a twenty-year sales period. <u>Id.</u> Further, the Plaquemine Project must be viewed as a new business, despite the fact that AEP is a veteran of the energy trade and energy as a business has been around for quite some time. As in

Schonfeld, AEP and TEMI had never jointly operated a facility, and were attempting to do so in a new market. Additionally, there was no established customer base. Thus, the Plaquemine Project represented not only a new business but a fledgling enterprise. The absence of historical profits to support AEP's calculation of lost profits, along with the conclusion that AEP's expert's projections were speculative in nature, deprive AEP of any lost profit damages through the Termination Payment.

## V. CONCLUSION

For the forgoing reasons, this Court finds that TEMI cannot prevail on its breach of contract claim. This Court further finds that TEMI breached the PPSA by: (a) repudiating, and failing to provide assurances of performance of, the PPSA; (b) refusing to pay for the minimum Baseload Energy, Baseload Capacity, and capacity for all other Products following Actual COD; (c) failing to increase its credit guaranty in violation of PPSA § 7.2.2; and (d) failing to make payments required by the January 15, 2003 Gas Peaking Amendment. Accordingly, TEMI is liable to AEP for $6,000,000 pursuant to the Gas Peaking Amendment, plus $116,499,287 for Replacement Products offered, including Baseload Capacity, Baseload Augmentation Capacity, Steam Peaking Capacity, and Baseload Energy, plus $493,570 for the Post-COD products, for a total of $122,992,857 plus pre-judgment interest. AEP is not entitled to lost profit damages. The Clerk of Court is directed to close any open motions and remove this case from my docket.

**SO ORDERED.**

New York, New York
August 8 , 2005

U.S.D.J.