UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
TRACTEBEL ENERGY MARKETING, INC.,  :
:
                    Plaintiff,  :        03 Civ. 6731 (HB)
:
                    -against-  :
:
AEP POWER MARKETING, INC.,  :
AMERICAN ELECTRIC POWER COMPANY,  :
INC. and OHIO POWER COMPANY,  :
:
                    Defendants.  :
------------------------------------------------------------------x
OHIO POWER COMPANY and  :
AEP POWER MARKETING, INC.,  :
:
                Counterclaim Plaintiffs,  :        03 Civ. 6770 (HB)
:
                    -against-  :
:
TRACTEBEL ENERGY MARKETING, INC.,  :        **OPINION, ORDER**
TRACTEBEL S.A.,  :        **<u>& JUDGMENT</u>**
:
                Counterclaim Defendants.  :
------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

    Following a bench trial and subsequent Opinion and Order from this Court on August 8, 2005, Tractebel Energy Marketing, Inc. ("TEMI") and AEP Power Marketing, Inc., American Electric Power Company, Inc., and Ohio Power Company (collectively, "AEP") filed cross-motions for reconsideration on August 26, 2005, pursuant to Fed. R. Civ. P. 52(b) and Local Civil Rule 6.3. AEP also filed a motion for attorneys' fees pursuant to Fed. R. Civ. P. 54(d)(2). For the following reasons, AEP's motions are GRANTED in part and DENIED in part and TEMI's motion is DENIED.

1

## I. BACKGROUND

The facts of this case are set forth in detail in the August 8, 2005 Opinion and Order, familiarity with which is presumed. Tractebel v. AEP, 2005 U.S. Dist. LEXIS 15972 (S.D.N.Y. Aug. 8, 2005)(Baer, J.). Briefly, on November 15, 2000, TEMI entered into a requirements contract, the Power Purchase and Sale Agreement ("PPSA"), with AEP. The PPSA stipulated that over a 20-year period of time, AEP would supply large quantities of electric power and related products and services to TEMI from a cogeneration plant to be constructed in Plaquemine, Louisiana (the "Plaquemine Facility").[1] This facility was to be located within an existing complex owned by the Dow Chemical Company ("Dow").

The PPSA contemplated that the parties "enter into a mutually agreeable Dispatch/Operations Coordination Protocol (the "Protocol"), not later than June 1, 2001" which would "set forth the detailed requirements for notice, forecast, scheduling, dispatch, operation, maintenance, maintenance coordination, approvals and other matters related to the operations and maintenance (including outages) of the Project and the sale and delivery of the Products." PPSA § 9.1. The Protocol never came to be. Apparently neither party was interested in its execution until after the deadline had passed, and then could not negotiate acceptable terms.

In order to cover a Termination Payment[2] in the event of either party's default, the parties agreed to a $50 million guaranty upon execution of the PPSA, and to provide a copy of its annual report and financial statements upon request from either party. PPSA §§ 7.1.1, 7.2.1, 7.3. If at any time a party had "reasonable grounds to believe" that the other party's Termination Payment "would exceed the value of the guaranty," it could, after giving written notice, request an increase in the guaranty in the amount of the projected Termination Payment. PPSA §§ 7.1.2, 7.2.2. The other party would then have five business

---

[1] Cogeneration is the use of a power station to generate both heat and electricity simultaneously. Cogeneration allows a more total use of energy than conventional generation, potentially reaching an efficiency of 70-90%, compared with 50% for the best conventional plants. The Plaquemine Facility is a cogenerational facility because the same generating units that produce electricity and in this case also produce steam for use in Dow's manufacturing processes.

[2] PPSA § 12.2 stipulates that in event of default, the non-defaulting party may "accelerate all amounts owing between the Parties and to liquidate and terminate all obligations under this Agreement," withhold "payments due to the defaulting Party," and "suspend performance." The "Termination Payment" equals the aggregation of all settlement amounts into a single amount. PPSA § 12.3.

days to increase its guaranty or it would be in default. Id. In April 2003, AEP requested an increase in TEMI's guaranty based on its calculation of which TEMI would owe as a Termination Payment. TEMI refused to provide any additional guaranty based on its belief that AEP's demand was unfounded and failed to meet the "reasonable grounds" language of the PPSA.

The PPSA provided that the Plaquemine Facility was to be operational by May 1, 2003, and that in case this date was not met, AEP would provide TEMI with Replacement Products,[3] or AEP would pay TEMI the Replacement Price.[4] PPSA §§ 11.4, 11.5. In Spring 2002, AEP informed TEMI that the plant would not be operational by the target date. The following year, AEP attempted to provide TEMI with Replacement Products; however, TEMI refused to accept the Replacement Products and claimed the products did not meet the specifications as defined in the PPSA. AEP billed TEMI for the Replacement Products despite TEMI's rejection.

After a bench trial, this Court held that TEMI could not prevail on its claim for breach of the implied covenant of good faith and fair dealing, and further that TEMI breached the PPSA by: (a) repudiating, and failing to provide assurances of performance pursuant to the PPSA; (b) refusing to pay for the minimum Baseload Energy, Baseload Capacity, and capacity for all other Products following Actual COD; (c) failing to increase its credit guaranty in violation of PPSA § 7.2.2; and (d) failing to make payments required by the January 15, 2003 Gas Peaking Amendment.

Accordingly, TEMI was found liable to AEP for $6,000,000 pursuant to the Gas Peaking Amendment in the PPSA, plus $116,499,287 for Replacement Products TEMI was obligated to take, including Baseload Capacity, Baseload Augmentation Capacity, Steam Peaking Capacity, and Baseload Energy, plus $493,570 for the Post-COD products, for a total of $122,992,857 plus pre-judgment interest. Finally, the Court held that AEP was not entitled to lost profit damages.

---

[3] "Replacement Products" means any capacity, energy, or ancillary services from a generation source other than the Project substantially equivalent to the Product intended to be replaced. PPSA § 1.133.
[4] "Replacement Price" means the price at which Buyer, acting in a commercially reasonable manner, could purchase a replacement for any capacity, energy, or ancillary services not delivered by the Seller, plus any additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, not to exceed the market price at the Delivery Point for such capacity, energy, or ancillary services. PPSA § 1.132.

3

## II. DISCUSSION

### A. AEP'S CLAIM FOR GENERAL OR COMPENSATORY RATHER THAN SPECIAL OR LOST PROFIT DAMAGES

First, AEP argues that the Court erred when it characterized the Termination Payment as a request for lost profits over the 20-year length of the contract (which requires a more difficult standard be met) and AEP really had only to meet a much less demanding burden, i.e., the burden for compensatory or general damages. AEP claims it seeks only general damages, i.e., the difference between the contract value and market price.

AEP seeks damages based on the Termination Payment due AEP as a result of TEMI's breach of the PPSA.[5] Termination Payment damages under the PPSA § 12 are a "Settlement Amount" defined as "Losses or Gains, and Costs." "Losses" are "the present value" of "the economic loss (exclusive of Costs) resulting from the termination of this Agreement," and "Gains" are "the present value of the economic benefit . . . resulting from the termination of this "Agreement." AEP claims that its Losses will exceed its Gains by a present value of $520.6 million over the next twenty years. Because this was a calculation for damages projected over a 20-year period in the volatile energy world provided by suspect testimony, I construed them as a claim for lost profits.

"A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" Schonfeld v. Hilliard, 218 F.3d 164, 175-76 (2d Cir. 2000) quoting 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.2(3) (1993). General damages are usually measured by the difference between the market value for a product and the contract price. Id. On the other hand, "special" or "consequential" damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach. The type of consequential damages most often sought is lost operating profits of a business." Id. Although the distinction between general and special contract damages is well defined, "its application to specific contracts and controversies is usually more elusive." American List Corp. v. U.S. News & World

---

[5] The Termination Payment is equal to the difference between the payments TEMI was required to make to AEP under the PPSA and the market value of the products TEMI was purchasing. PPSA §§ 12.2, 12.3.

4

Report, Inc., 75 N.Y.2d 38 (1989). In this case, the amount of damages sought by AEP resembles most closely consequential damages, and this is so despite counsel for AEP's remark in his closing that this "is not a traditional lost profits case." (Tr. 1999-2000). AEP's claim is appropriately characterized as one for consequential damages because it is a measure of "income or loss, or cash flow, including losses that may result far into the future." 3 Dobbs § 12.2(3) at 42. It "covers an indefinite future as well as a certain past," and "a reduction in income" from an "ongoing operation" – the Plaquemine plant. Most of all "the proof is 'speculative.'" Id., § 12.4(3) at 71-72.

AEP begs the question when it contends it is entitled to general damages i.e., the present value of the difference between (i) the contract payments that TEMI was required to make over the 20-year term of the PPSA and (ii) the fair market value of those products. PPSA § 12.2, 12.3. Things are not always what they seem, and this is such a case. AEP was unable to prove anything close to a reasonable estimate of the damages it sought and therefore even looked at as a claim for general damages, AEP has failed to meet its burden.

AEP argues that a plaintiff seeking general damages need only present a "reasonable estimate" of the "approximate" present value of the breaching party's performance under the contract. Markowitz & Co. v. Toledo Metropolitan Housing Authority, 608 F.2d 699, 707 (6th Cir. 1979) ("The uncertainties of valuation are frequently so great that all that can be hoped for is an honest and reasonably intelligent estimation, especially in a case where the breach carries consequences twenty years into the future."). But any estimate of damages, even by this standard, must be reasonable, and uncertainty especially in a market such as this must be considered. Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir. 1991) (A plaintiff that claims damages for breach of contract cannot rely on speculative assessments or conjecture.); Isaac H. Blanchard Co. v. Rome Metallic Bedstead Co., 184 A.D. 187, 193 (1st Dep't 1918)("We agree with the contention that the damages sought to be recovered for the alleged breach of this contract were so problematical and speculative, and depended upon so many elements which the future alone could disclose, that the fixing of any definite sum as recoverable was quite impossible."). This is a situation where neither party was able to make even a

5

reasonable estimate of the approximate present value of the contract, and the last few years of American history, or at least American energy history, only make the cheese more binding.

As I stated in the August 8, 2005 Opinion and Order, both parties' experts agreed that the usual technique used to project damages, using forward market prices to estimate future revenues, could not be employed here. And as such used a substitute method which

> required "a large number of assumptions" to support AEP's claim of $520 million lost profit damages. (Krapels Tr., 1807:17-19.) In order to know what AEP's revenues would be over the next twenty years, one would have to be able to presage a vast and varied body of facts. Any projection of lost profits would necessarily include assumptions regarding the price of electricity and the costs of operating over twenty years. One would also need to surmise what competing forms of energy such as coal and nuclear energy would cost over the same time period. Also factoring into this calculation are the political and regulatory developments over twenty years, population growth in the Entergy region, and technological advances affecting the production of power and related products. With so many unknown variables, these experts might have done as well had they consulted tealeaves or a crystal ball.

Tractebel v. AEP, 2005 U.S. Dist. LEXIS 15972 at *50-51.

I found both experts provided unreliable testimony and worse yet, it appeared to be clouded by their obvious advocacy, to paraphrase a popular show tune, on behalf of the lady they came in with. AEP claims that it has satisfied its burden through the testimony of its expert, Dr. Krapels. I disagree. While I found TEMI's expert Dr. Rausser less than credible, my August 8, Opinion and Order found Dr. Krapels' analysis equally flawed. There were simply too many unknowns to permit a reasonable estimate of damages 20 years into the future. In addition, Dr. Krapels' formula "contained misdirection and conflicting data that made it impossible for TEMI to replicate his results," and those discrepancies in his data sets "hardly enhanced his faltering credibility or confidence in his analysis." Id. Furthermore, Krapels could only estimate a Termination Payment somewhere between $417

6

and $604 million dollars leaving a gap of $187 million between the low-and high-end estimates.

There were also problems with Krapels' assumptions, for example, he assumed that every plant he considered had the exact same variable operating and maintenance expenses. (Tr. 1817-18.) He described this assumption as an error. He also assumed that there will be a constant surplus of capacity for the next 20 years, while admitting that there is no historical precedent for that assumption. (Tr. 1815-1817.)

### B. AEP'S CLAIM FOR ATTORNEYS' FEES

AEP maintains that because this Court held that TEMI was the party to breach the PPSA, TEMI is responsible for AEP's reasonable attorneys' fees. AEP bases this argument on § 12.3 of the PPSA which, as stated above, allows a non-breaching party to receive a Termination Payment. Such a Payment consists of the net of all "Settlement Amounts" and other amounts due to the Defaulting Party. Settlement Amounts are defined in § 1.138 of the PPSA as "with respect to the Non-Defaulting Party, the Losses or Gains, and Costs, expressed in U.S. Dollars, which such party incurs as a result of the termination of this Agreement pursuant to Section 12.2." Costs, in turn, are defined to include "all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with the termination of this Agreement." PPSA § 1.42.

TEMI argues that these PPSA provisions strung together did not intend to authorize reimbursement of litigation-related attorneys' fees to the non-defaulting party. The reason being that under the PPSA, the only attorneys' fees payable are those incurred at the time of the Event of Default; not fees incurred in connection with litigation, which could be years later. PPSA § 12.4, the "Notice of Payment of Termination Payment," provides:

> As soon as practicable after a liquidation and termination, notice shall be given by the Non-Defaulting Party to the Defaulting Party, including the amount, if any, of the Termination Payment. The notice shall include a written statement explaining in reasonable detail the calculation of such amount. The Termination Payment shall be payable within two (2) Business Days after such notice is effective.

If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment "within two (2) Business Days of its receipt of the Non-Defaulting Party's calculation" the Defaulting Party must provide a "detailed written explanation of the basis for such dispute." PPSA § 12.5. TEMI argues that this procedure is inconsistent with an expectation to include attorneys' fees in the event of litigation.

Under the general rule in New York, attorneys' fees are ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule. See Bourne Co. v. MPL Communications, Inc., 751 F. Supp. 55, 57 (S.D.N.Y. 1990). In construing this attorneys' fees clause, like any question of contract interpretation, this Court must determine the intent of the parties. United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 77 (2d Cir. 2004); Hooper Assocs., Ltd. v. AGS Computers, Inc., 549 N.Y.S.2d 365, 367 (N.Y. 1989)("Words in a contract are to be construed to achieve the apparent purpose of the parties.").

AEP argues that the phrase "all reasonable attorney's fees" should be construed broadly and that to limit it to attorneys' fees due at the time of the default would render the provision meaningless. See Manley v. Ambase Corp., 337 F.3d 237, 250 (2d Cir. 2003)(New York law "disfavors interpretation that render contract provisions meaningless or superfluous.") But there is a logical application for this phrase. The fees referred to are the fees contemplated "in connection with termination" of the PPSA. If the Termination Payment amount included a calculation of attorneys' fees for future litigation, surely the parties, sophisticated lawyers that they are, would have said so or the phrase would make sense. Here, neither is true. The contract is silent on this score and if it was contemplated to include litigation fees like these it would make no sense to require the amount to be made payable "within two (2) Business Days after notice is effective." PPSA § 12.4. Also, the Defaulting Party could not possibly provide its "detailed written explanation" to dispute the amount "within two (2) Business Days of its receipt of the Non-Defaulting Party's calculation." PPSA § 12.5. At the very least, these clauses, read together, create an ambiguity with regard to the parties' intent to include litigation related attorneys' fees.

Ambiguities in contractual language should be resolved by looking at the conduct of the parties. IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370 (2d Cir. 1994). AEP's conduct is telling with regard to this issue. AEP did not raise the issue of attorneys' fees at any point during the litigation prior to its August 26, 2005, post-trial motion for reconsideration. To be specific, AEP did not raise or discuss litigation-related attorneys' fees or non-taxable expenses in (1) its September 5, 2003 initial Complaint, (2) its August 13, 2004 discovery responses, (3) its September 1, 2004 First Amended and Supplemental Complaint, (4) its portion of the March 7, 2005 Joint Pretrial Order or Pretrial Memorandum, (5) the March 14 2005 Amended Joint Pretrial Order, or (6) its April 29, 2005 Post-Trial Brief.

AEP argues that failure to plead attorneys' fees should not be fatal to the success of its claim. It is true that this Court has held that attorneys' fees may be asserted as late as post-trial motions – so long as the parties were not prejudiced. See Southern Indus. of Clover, Ltd. v. Zenev Textiles S.A., 2004 U.S. Dist. LEXIS 11759 (S.D.N.Y. June 25, 2004) (Baer, J.). But that does not mean that the conduct of the parties should be ignored. While this conduct may not mean that AEP has waived a right, should such a right have existed, it certainly bespeaks the intent of the parties, that litigation-related attorneys' fees were not part of their consideration at the time the PPSA was drafted.

AEP also argues that without some express limitation, the language "all attorneys' fees" should be construed broadly. But words of limitation do exist – that the parties expected that the amount of the Termination Payment would be due two days after default and any objections could be provided in detail within two days of that. This necessarily limits the scope of what attorneys' fees could reasonably be included in the Termination Payment. Any award of attorneys' fees would be inappropriate.

### C. TEMI'S CLAIM FOR A REDUCTION IN DAMAGES

TEMI argues that the $116,499,287 awarded in damages for the Replacement Products offered by AEP should be reduced because the provisions in the PPSA are tantamount to "unlawful penalties" because AEP did not spend nearly that much to provide

the products. AEP billed TEMI monthly for capacity and Replacement Products TEMI was obligated to take pursuant to the "Must Take" provision of the PPSA § 3.1.4.4. The PPSA stipulated that the Plaquemine Facility was to be in operation by May 1, 2003, or the Target COD date, and if this date was not met, AEP would provide TEMI with Replacement Products. PPSA §§ 11.4, 11.5. The facility was not finished by that date and AEP was ready, willing, and able to provide Replacement Products, however, TEMI refused to accept them. TEMI was required by the PPSA to pay for a minimum amount of the Baseload Product as of the Target COD. Tractebel v. AEP, 2005 U.S. Dist. LEXIS 15972 at *21.

TEMI argues that these payment obligations are unenforceable because they impose an unlawful "penalty" on TEMI for breach of the PPSA. TEMI cites Corbin on Contracts to support its contention that contract provisions are unlawful penalties when they require payment of a fixed sum regardless of the extent of the injury. Corbin on Contracts § 1066 (2005). Unfortunately this penalty analysis is misplaced here because it only applies to liquidated damage provisions – not our case. Here, the issue is TEMI's obligations to pay for the Replacement Products that were part of its contractual obligation.

> Stipulated sums in a contract are not necessarily subjected to the penalty analysis. First, some dollar amounts due under a contract may not be damages at all because they are not payable upon breach; they are rather simply the payment or performance called for by the contract …. The obligation to pay is the substance of the contract, not merely a measure of damages for breach of some other provision.

3 Dobbs Law of Remedies § 12.9(4) at 261.

> [T]he law permits an individual to fix the price of his own property or service or the price that he is willing to pay for the property or service of another, and it will enforce an agreement to pay such a price. The amount is not called a penalty, even though it may be an exorbitant price.

Corbin on Contracts § 1069. Here, TEMI's obligation to pay for capacity and minimum amounts of energy at the prices set forth in the PPSA is simply the performance called for by the PPSA.

Even if this provision could be analyzed under an unlawful penalty theory, TEMI would not be entitled to a reduction in damages. Under New York Law, a liquidated damages clause is enforceable if (i) the amount of actual loss would be difficult to calculate at the time of contracting; and (ii) the fixed damage amount is reasonable in view of the probable loss. See Ehreworth v. Kaufelt, 797 N.Y.S.2d 238, 239 (N.Y. App. Div. 2005). As the party challenging the applicability of these contractual provisions, TEMI has the burden of showing that the charges by AEP failed to meet these requirements. Rattigan v. Commodore Int'l Ltd., 739 F.Supp. 167, 170 (S.D.N.Y. 1990).

With respect to (i), when the PPSA was executed in 2000, it would have been difficult to calculate the damages AEP would suffer if TEMI later breached its "Must Take" or Capacity Payment obligations. The fundamental purpose of the PPSA was to assure that AEP would construct a large power plant at Plaquemine from which TEMI could dispatch energy products over a fixed 20-year period. In exchange for those rights, TEMI promised to make capacity payments, and to purchase minimum amounts of energy at specified prices to commence at Target COD. (ii) The purpose of the negotiated payment obligations was to create an early revenue stream so AEP could recoup some of its construction costs, which were substantial. While if looked at simply as a charge to TEMI of $116,499,287 for replacement products that cost only $2 million it may appear to be a windfall. The fact is that AEP spent over $500 million to build the Plaquemine Plant, which but for the contract with TEMI would not have been built. Here, as other courts have recognized, energy payment provisions are, in reality, an agreement to pay for more than just the energy itself. See e.g., Superfos Invs. v. Firstmiss Fertilizer, 821 F. Supp. 432, 435 (S.D. Miss. 1993)(payment there was intended to compensate the producer for the costs to produce the natural gas and to ensure a steady source of income so that production could continue); see also Corbin on Contracts § 59.10 ("primary purpose and justification for including a take-or-pay clause is to assure recoupment by the supplier of substantial capital investment required to develop production of the subject matter of the contract"). The provision here is not a take-or-pay clause but the analysis is the same. As a consequence, the amount charged for the replacement products is reasonable.

### D. TSA GUARANTY

The PPSA required TEMI to provide a $50 million guaranty from Tractebel S.A. ("TSA") to guarantee TEMI's contractual obligations to AEP. See PPSA §§ 1.99, 7.3. The November 17, 2000 Guaranty ("TSA Guaranty") provides that TSA "irrevocably and unconditionally guarantees to the Beneficiary [AEP], its successors and assigns the prompt payment when due, of all present and future obligations and liabilities of all kinds of the Company [TEMI] to the Beneficiary arising out of the Agreement." TX-606. TEMI does not contest the validity of this Guaranty. As such, the Judgment will be amended to reflect this additional amount.

### V. CONCLUSION

For the forgoing reasons AEP's motions are GRANTED in part and DENIED in part, and TEMI's motion is DENIED. The Judgment should be amended as follows:

TEMI is liable to AEP for $6,000,000 pursuant to the Gas Peaking Amendment in the PPSA, plus $116,499,287 for Replacement Products TEMI was obligated to take, including Baseload Capacity, Baseload Augmentation Capacity, Steam Peaking Capacity, and Baseload Energy, plus $493,570 for the Post-COD products. TEMI is also liable for the TSA Guaranty in the amount of $50,000,000, for a total of $172,992,857 plus pre-judgment interest. Any award of attorneys' fees is denied.

The Clerk of Court is directed to close any open motions and remove this case from my docket.

**SO ORDERED.**

New York, New York
January 20, 2006

_[signature]_
U.S.D.J.